Lucas v. Hart.

## LUCAS *v.* HART.

An estoppel *in pais*, if proved, will operate as effectually against a party, as if constituted by deed or record.

An estoppel is allowed to prevent fraud and injustice, and exists whenever a party cannot, in good conscience, gainsay his own acts or assertions.

It makes no difference in the operation of the estoppel, whether the thing admitted, was true or false; it being the fact that it has been acted upon, that renders it conclusive.

If one man knowingly, though he does it passively, by looking on, suffers another to purchase and expend money on land, under an erroneous opinion of title, without making known his claim, he shall not afterwards be permitted to assert his legal right against such person.

In order to constitute an estoppel *in pais*, it must appear: 1. That the party has made an admission which is clearly inconsistent with the evidence he proposes to give, or the title or claim which he proposes to set up; 2. That the other party has acted upon the admission; and 3. That such other party, or those claiming under him, will be injured by allowing the truth of the admission to be disproved.

*Appeal from the Johnson District Court.*

TUESDAY, DECEMBER 29.

*In Chancery.* On the 6th of October, 1843, one Harris recovered judgment against the defendant Hart, in the

district court of Johnson county, who, at the time, owned lot 3 in block 42, in Iowa City. On the 22d of July, 1844, this lot, together with lot 4 in the same block, was sold under a *pluries* execution, issued on said judgment, to the plaintiff therein, for three hundred dollars. Harris died, and in July, 1849, his administrator, under an order of the probate court, sold said lot to one Fisher. On the 17th of the same month, Fisher sold to Walworth, and in June, 1850, Walworth sold to Kase. On the 22d of November, 1853, Kase, by his deed, conveyed to Lucas, the complainant, which deed, however, was not delivered until the 15th of December of the same year.

On the 10th of December, 1853, Hart commenced his action at law against the said Kase, for the recovery of said lot, to which the complainant was afterwards made a party. In April, 1854, this bill was filed, setting up the above facts, and various acts and admissions of the said Hart, as well as numerous circumstances, which complainant claims, in equity, have the effect of defeating any claim of respondent to the property. The bill prays an injunction, which was granted. The respondent answered, to which there was a replication, and the cause was submitted on this state of the pleadings, with depositions and a large amount of record evidence. Decree for complainant, and respondent appeals. The other substantial facts, will appear from the opinion of the court.

*Clarke & Henley*, for the appellant.

*J. D. Templin & Co.*, for the appellee.

WRIGHT, C. J.—In this case, counsel for the appellant, in their argument, have presented two questions:

*First.* Was the sale of the lot, under the execution to Harris, valid?

*Second.* Do the circumstances, as proved, show that Hart is estopped from asserting his title?

The appellee does not claim that the proceedings, under

the judgment and execution, were valid; but, by his argument, insists substantially, that, though invalid, the respondent is in no position to take advantage of the errors and irregularities attending such proceedings. We shall, therefore, direct our attention entirely to this view of the case, expressing no opinion as to the effect of these irregularities upon the title of the purchaser, under the execution. Without giving the testimony in detail, we will state, as briefly as possible, what, in our opinion, is proved —or, the facts of the case, as gathered from the pleadings and evidence.

And—*first*. It is admitted that the judgment was recovered, and the property sold thereunder, as stated in the bill.

*Second*. Hart was in possession at the time of the sale, and quit the same afterwards; and, whether he put the administrator of Harris into possession, or not, he, at least, knew that such possession was taken by him, and, subsequently, by those claiming under the sale made by such administrator.

*Third*. He resided, from the time of sale under the execution, until the commencement of his suit, in the same town, and, for a part of the time, at least, in sight of the property.

*Fourth*. Improvements were made on the property during the time, but there is nothing to show that respondent consented thereto; nor that he had any knowledge of the same, further than is to be inferred from the fact of his residing near the house.

*Fifth*. He paid no taxes on the property after the sale, nor did he list it as his own; but it was listed, and the taxes paid, by the respective parties claiming under the sheriff's sale.

*Sixth*. On the 5th of January, 1850, he paid to the administrator of Harris, the balance due on said judgment, and, at that time, the amount for which the property had sold under the execution, was accounted to him, without

objection on his part, or any claim that the sale was invalid.

*Seventh.* On two occasions, at least, he stated that he had no title to the property; and that the only thing in the way of a perfect title, was the fact that his wife had never released her dower to the same.

*Eighth.* From the time of the sale, in 1844, until the commencement of his suit, in 1853, there is nothing to show that he pretended to have any right to the property, or that he set up any claim to the same; nor is there any sufficient reason shown for his not asserting his title.

*Ninth.* There were improvements upon the lot, consisting of a house, at least, which was, after the surrender of the possession by him, occupied by the several persons claiming under the sheriff's sale, or their tenants.

*Tenth.* To one witness, who designed bidding on the property, on the day of the sale by the administrator, he stated that he "had owned the property, and that the title was good;" and to the administrator, before he had made the sale, and before he obtained his authority for that purpose, he said: "Go on and make the sale—it will be all right."

*Eleventh.* The administrator also swears, that before doing anything about the property, after his appointment, and after the time for the redemption of the property had expired, he consulted with respondent, who said he would like time to redeem; that he proposed to let him have a longer time; that this run over, when respondent told him, that it was impossible for him to redeem; and he might go on and sell the lots—it would be all right; that he told him he had sold, and respondent made no objection; and that when he acknowledged satisfaction of the judgment, he allowed respondent, at his request, some amount over and above the sum for which the property was sold by the sheriff, but how much, he does not recollect.

*Twelfth.* Kase, at the time of his sale to complainant, was a non-resident; the price was agreed upon between

them by letters written; the deed was forwarded to the agent of Kase; and after its receipt, the deed delivered, and part of the purchase money paid, but before the mortgage was given by the complainant, to secure the balance of the purchase money, and the whole business closed, complainant had notice of the commencement of the suit by respondent, to recover the lot.

Under such circumstances, is respondent estopped from setting up a title to the lot in controversy? We think he is.

Estoppels are of three kinds, viz: by matter of record, by deed, and *in pais*. Those by matter of record, or by deed, are denominated technical estoppels. It is not pretended that the acts set up in this case, belong to either of these two classes, but that they operate as an estoppel under the third class—an estoppel *in pais*. If proved, it will operate as effectually, however, against the respondent, as if constituted by deed or record. It is said in relation to this class, that there can be no fixed and settled rules of universal application, to regulate them, as in technical estoppels; that there are many acts, which have been adjudged to be estoppels *in pais*, such as entry and acceptance of rent; but that in many, and in probably most instances, whether the act or admission shall operate by way of estoppel or not, must depend upon the circumstances of the case. *Welland Canal Co.* v. *Hathaway*, 8 Wend., 481.

There are, however, some rules generally recognized in the cases, which may materially assist in determining, whether the acts of the respondent shall conclude him from asserting his claim to this property. To some of these, we propose briefly to refer. The estoppel is allowed to prevent fraud and injustice, and exists wherever a party cannot, in good conscience, gainsay his own acts or assertions. And it makes no difference in the operation of this rule, whether the thing admitted was true or false, it being the fact that it has been acted upon, that renders it conclusive. *Frost* v. *Saratoga Mutual Ins. Co.*,

5 Denio, 154; 1 Greenl. Ev. sections 22, 27, 204, 207, 208, 209; 1 Story's Eq., Jur,, section 387.   It arises where " a man's own act or acceptance, stoppeth or closeth up his mouth, to allege or plead the truth."  Co. Litt., 352.  Says Chancelor Kent, in *Wendell* v. *Van Renssellaer*, 1 Johns. Ch., 344, "there is no principle better established in this court, nor one founded on more solid considerations of equity and public utility, than that which declares, that if one man, knowingly, though he does it passively, by look- ing on, suffers another to purchase and expend money on land, under an erroneous opinion of title, without making known his claim, he shall not afterwards be permitted to assert his legal right against such person.   It would be an act of fraud and injustice, and his conscience is bound by this equitable estoppel."

In that case, defendant claimed under a deed made in 1794, and did not assert his right under the same, until 1808.   Improvements were being made upon the prem- ises, in full view of defendant's residence, and in some instances, at least, he had knowledge that the person making the improvements, had purchased from his grantor, "Having," says the Chancellor, "for such a length of. time, suffered the public to deal with the testator, (the person under whom defendant claimed), as the real owner, he cannot now be permitted to question, or disturb any title, which has been procured by his tacit consent."

And, again, it is said, that where a party, either by his declaration or conduct, has induced a third person to act in a particular manner, he will not afterwards be per- mitted to deny the truth of the admission, if the conse- quence would. be to work an injury to such third person, or to some one claiming under him.   *Dezell* v. *Odell*, 3 Hill, 215.   In the same case, it is said, that in order to conclude a party, it must appear: 1. That he has made an admission which is clearly inconsistent with the evidence he proposes to give, or the title or claim which he pro- poses to set up; 2. That the other party has acted upon the admission; and 3. That he will be injured by allow-

ing the truth of the admission to be disproved.    And in 8
Wendell, 483, it is said, that the acts and admissions of a
party operate against him in the nature of an estoppel,
where, in good conscience and honest dealing, he ought
not to be permitted to gainsay them.    The acts or admis-
sions, will not operate as an estoppel, unless the party has
acted upon them, and then it will only be conclusive in
favor of the party who has so acted, and persons claiming
under him, and not in favor of strangers.    *Hearne* v.
*Rogers,* 9 Barn. & C., 577; *Willis* v. *Truesdell,* 6 Pick.,
455.

In *Stows* v. *Barker,* 6 Johns., Ch. 166, the plaintiff
claimed under, and the defendant adverse to, the will of
one Ruth Foster.    The conduct of the defendant was
such as to clearly estop him from denying the validity of
the will, unless one or both of two positions assumed by
him were correct.    The first was, that he did not know,
until about the time of the commencement of his suit in
ejectment, that the devise of a *femme covert* was void, or
that his title was good as heir to his daughter, and that
whatever he had said or done, was in ignorance of law
and his rights.

As to this, the Chancellor says: "that the presumption
is, that every person is acquainted with his own rights,
provided he has had reasonable opportunity to know them,
and nothing can be more liable to abuse, than to permit a
person to reclaim his property, in opposition to all the
equitable circumstances which have been stated, upon the
mere pretence that he was, at the time, ignorant of his
title.    Such an assertion is easily made, and difficult to
contradict.    This ignorance of the law, ought not to pro-
tect him from the operation of the rule of equity.    He
could easily have dispelled that ignorance, for he had the
fact of the will of his daughter before his eyes; and if he
may be allowed to plead his voluntary ignorance, in de-
struction of equitable rights, growing out of his own acts
and assertions, the grossest imposition, and the greatest
fraud, might be practiced with impunity.    It would seem,

therefore, to be a wise principle of policy, that ignorance of the law, with knowledge of the fact, cannot generally be set up as a defence; and it appears to be settled, by a course of equity decisions, that ignorance of one's legal rights, does not take the case out of the rule, when the circumstances would, otherwise, create an equitable bar to the legal title." And in support of these positions, the Chancellor refers to, and comments upon, the following cases: *Dyer* v. *Dyer*, 2 Ch. Cas., 108; *Hobbs* v. *Norton*, 1 Verm., 136; S. C., 2 Ch. Cas., 128; *Hunsden* v. *Cheyney*, 2 Verm., 150; *Teasdale* v. *Teasdale*, Select Cas. Ch., 59. And see, *Pierson* v. *Armstrong*, 1 Iowa, 282.

The second point urged by defendant, was that the plaintiff, equally with him, was presumed to know that the will of a *femme covert* was void. To this, it was answered, that "if plaintiff was ever acquainted with the rule of the law, he had a good right to presume, from the acts and conduct of defendant, that the will of the daughter had been either previously authorized by the defendant, or had received a valid recognition by him, since her death. He had a right to consider the defendant's title, as heir, duly waived or abandoned."

Under these authorities, we have no hesitation in holding, that the acts and admissions of respondent, estop him from now asserting a title to this property. To permit him to do so, would, in our opinion, be unconscionable, and contrary to that fairness and honest dealing, which courts of equity should ever seek to promote and encourage. We can see no good or sufficient reason, why respondent should, for almost ten years, remain passive, or fail to make known his claim upon this lot. There is nothing in the least tending to show, that he had not as full knowledge of the defects of the sheriff's sale, at the time it occurred, as he had at the time he brought his action at law. He voluntarily satisfied the judgment upon which the lot was sold, and received the full benefit of that sale. On such settlement, he was allowed an additional amount, because of some claim set up by him, that his property had been

sacrificed.   He asked, and obtained further time to re-deem, and, failing in this, he makes no claim to the prop-erty, but directs the administrator to treat the property as belonging to the estate, and proceed to sell the same.  But for this course, on the part of respondent, or, had he then made his claim, there can be no doubt but the administra-tor would have taken steps to settle the title, and omitted to sell the same, as the property of the estate.

It is said that Lord Mansfield would not suffer a man to recover, even in ejectment at law, who had stood by and seen the defendant build upon his land.   6 Term Rep., 555.   In this case, the respondent has permitted, for a pe-riod of nine years and more, this title under the sheriff's sale, to stand unquestioned; has known that possession was taken under it, and improvements made by those hold-ing under that title ; and thus we have a case very much stronger, in its equitable circumstances against respondent, than if he had merely permitted the erection of a house upon his land.   To allow respondent to now prefer and sustain his claim, we are satisfied, would be greatly to the prejudice of complainant.   And we are equally satisfied, that the complaniant did not act upon the acts and conduct of respondent, yet the person under whom he claims, did act upon, and was influenced by them.   Complainant had a right, as had those under whom he claims, to presume that all claim of respondent to the property was either waived or abandoned.

Decree affirmed.